UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| HUDSON CONSTRUCTION COMPANY,<br><br>Plaintiff,<br><br>vs.<br><br>MARTIN MARIETTA MATERIALS, INC.,<br><br>Defendant. | Civil Action No.  2:18-cv-642-BHH<br><br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

This matter came before the Court for a bench trial on March 23, 2021 at 10:00 a.m., which trial concluded on March 24, 2021 at approximately 4:30 p.m. Plaintiff Hudson Construction Company ("Plaintiff" or "Hudson") offered evidence in support of its claims for breach of contract, negligent misrepresentation, breach of express and implied warranties, negligence, promissory estoppel, equitable estoppel, and equitable indemnity. The Court denied Defendant Martin Marietta Materials, Inc.'s ("Defendant" or "Martin Marietta") oral motion for a directed verdict at the close of Plaintiff's evidence. Martin Marietta offered evidence in defense of Hudson's claims and in support of its counterclaim for breach of contract. Based on the evidence offered during the trial on the merits, the Court now makes the following findings of fact and conclusions of law.

**I.     FINDINGS OF FACT**

**(A)     Purchase and Sale of Material**

On or about February 24, 2016, Hudson and Martin Marietta entered into a written agreement, the terms and conditions of which Hudson agreed would apply to all purchases of product by Hudson, as buyer, and Martin Marietta, as seller ("Sales Agreement"). (Def. Ex. 1.) The Terms and Conditions of Sale provide the following

relevant provisions:

> 1. Acceptance of any order from [Hudson] ("Order") is expressly made conditional on assent to these Terms and Conditions, either by written acknowledgement or by [Hudson's] acceptance of the products sold hereunder. These Terms and Conditions also serve as [Martin Marietta's] objection to and rejection of any terms and conditions included in [Hudson's] forms that are different from or additional to these Terms and Conditions. . . .
>
> 4. At the time of shipment, [Martin Marietta] warrants good title and conformance to the written specifications stated on the front of any order acknowledgement from [Martin Marietta], or, if no written specifications are stated, the customary specifications of [Martin Marietta] for such products from the facility of [Martin Marietta] providing the products. No other specifications will apply, including those relating to moisture. Other than the warranties stated in the first sentence of this paragraph, [MARTIN MARIETTA] HEREBY EXCLUDES ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, WRITTEN OR ORAL, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, AS TO THE PERFORMANCE OF ITS AGGREGATES WITH RESPECT TO ALKALI-AGGREGATE REACTIVITY OR OTHERWISE. . . .
>
> 6. IF PRODUCT IS UNSATISFACTORY, [MARTIN MARIETTA'S] LIABILITY IS LIMITED TO FURNISHING REPLACEMENT MATERIAL. IN NO EVENT SHALL [MARTIN MARIETTA] BE LIABLE TO [HUDSON] FOR LOSS OF PROFITS OR REVENUE OR FOR ANY OTHER CONSEQUENTIAL, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES. . . .
>
> 13. The laws of the state of North Carolina shall govern the validity, interpretation, construction and effect of these terms and conditions and any Order, without regard to principles of conflict or choice of law.
>
> 14. These Terms and Conditions shall control the sale and purchase of the products by [Martin Marietta] and any credit extended in connection therewith, and may not be modified or altered in any way unless expressly approved in writing by a duly authorized representative of [Martin Marietta]. Any acceptance by [Hudson] that changes the terms hereof will not be effective.

(*Id.* at MM_000012.) The Sales Agreement, including the Terms and Conditions of Sale,

is signed by a duly authorized representative of Hudson. (*Id.* at MM_000012–MM_000013.)

On or about March 30, 2017, Hudson issued a Purchase Order to Martin Marietta for the purchase of 7,800 tons of micro-surfacing aggregate material[1] from Martin Marietta's quarry located in Cayce, South Carolina (the "Cayce Quarry"), at a unit price of $15.50 per ton, for a total of $129,363.00. (Def. Ex. 41.) On or about April 21, 2017, Martin Marietta issued a Sales Order to Hudson, consistent with Paragraph 4 of the Terms and Conditions of Sale in the Sales Agreement, confirming the $15.50 per ton unit price for the dry screenings material. (Def. Ex. 39.) The Sales Order states, consistent with the terms of the Sales Agreement and in relevant part: "IN THE EVENT MATERIALS ARE UNSATISFACTORY, OUR LIABILITY IS LIMITED TO FURNISHING REPLACEMENT MATERIAL." (*Id.*)

The material was to be shipped FOB Cayce Quarry by a third-party trucking company hired by Hudson, and delivered to one of two Hudson jobsites, commonly referred to as "Design Street" and "US 78." (Def. Ex. 1 at MM_000012, ¶ 5.) The material was for use by Hudson in the "Charleston/Colleton Project," a roadway surface treatment project awarded to Hudson in January 2016 after Hudson submitted a bid to the South Carolina Department of Transportation ("SCDOT") that included Martin Marietta's bid to Hudson for the micro-surfacing aggregate material. Martin Marietta was not a party to Hudson's contract with the SCDOT, and no evidence was introduced to show that Hudson provided Martin Marietta with a copy of the contract.

---

[1] The quote solicited by Hudson was for "dry screenings," but trial testimony established that micro-surfacing aggregate is a specific type of "dry screening."

3

**(B)     Micro-Surfacing Aggregate Material**

Micro-surfacing aggregate is a type of fine crushed mineral aggregate screening primarily characterized by its gradation. (Dukatz Trial Test.) It is mixed on-site by the paving contractor with emulsion, water, setting additives, and cement, using specialized equipment. (*Id.*) Micro-surfacing is a product which requires constant monitoring to adjust for changing ambient and material properties. (*Id.*) Failing to account for changes in a timely fashion will result in product deficiencies such as pre-mature break. (*Id.*) Placing micro-surfacing is a constant balancing act by the contractor to maintain the correct proportions of materials at the correct temperature so that the micro-surface sets as planned. (*Id.*)

Section 410.2.1 of the SCDOT Specifications for Highway Construction concerning micro-surfacing aggregate ("SCDOT Specifications") provides, among other things, that the micro-surfacing aggregate should have a sand equivalent ("SE") value of not less than 65. (*Id.*) When testing for SE, several samples must be taken to show the general consistency of the stockpile. (*Id.*) Tests for micro-surfacing aggregate SE, as with all test methods are subject to inherent variability; according to governing industry standards the typical variation for a single user testing the same sample repeatedly can yield results that vary by as much as 8 percent on the SE value. (*Id.*) Thus, an isolated test result showing an SE below specification is not necessarily indicative of a failure of the material for paving purposes. (*Id.*) A contractor's failure to properly handle and store the material, can also lower the measured SE value and impact the set time of the material. (*Id.*)

**(C)     Material Supplied by Martin Marietta to Hudson**

Shipments of the micro-surfacing material from Martin Marietta's Cayce Quarry

4

began in April 2017 and continued as requested by Hudson. On or about June 20, 2017, Hudson told Martin Marietta it was experiencing problems laying some of the material from the Design Street job site—specifically, that the mix was setting too quickly. Matt Sony, Hudson's foreman for the Charleston/Colleton Project, testified that Hudson's paving crews were "struggling" with the material for much of June 2017, and that the mix became unusable by the end of the month. Hudson later alleged that the material's SE was too low and that this failure to meet SCDOT Specifications made the material unusable from a practical standpoint. Martin Marietta promptly invited representatives from Hudson to visit the Cayce Quarry to observe Martin Marietta's production, stockpiling, and testing procedures. Martin Marietta has in place quality control protocols and employs quality control technicians who are trained to sample and test the material. Charlie Bagley, Martin Marietta's South Carolina quality control manager, testified that the material is tested throughout the production process and is also tested prior to shipment. Mr. Bagley further testified that all of the material samples tested from Martin Marietta's shipping stockpiles at the time of the Charleston/Colleton Project met SCDOT Specifications, and all of the samples of material actually supplied to Hudson tested within SCDOT Specifications at the time of shipment. (Bagley Trial Test.; Def. Exs. 27–29, 31–37.)

In addition to inviting Hudson to visit the Cayce Quarry, Mr. Bagley promptly visited Hudson's job sites, where he observed numerous issues with Hudson's handling and storage of the material, including but not limited to mud and other deleterious materials mixed in with the stockpiles. (Bagley Trial Test.; Def. Ex. 12.) In an effort to help Hudson resolve its issues at the job site, Martin Marietta supplied material from its shipping

5

stockpiles for Hudson to sample. (Bagley Trial Test.) Hudson indicated it was satisfied with the material, and requested more material, which Martin Marietta began supplying. (*Id.*)

**(D)     Hudson Switches Suppliers**

On July 11, 2017, shortly after Martin Marietta began supplying the additional material requested by Hudson, Hudson told Martin Marietta it already had contracts with a new supplier for the material. (Manos Trial Test.; Def. Ex. 73.) The same day, Martin Marietta asked to meet with Hudson to discuss a resolution, but Hudson responded that any such meeting would have to take place after the paving season was over. (*Id.*) As a customer courtesy and in an effort to move the parties' relationship forward, Martin Marietta agreed to credit the unused material to Hudson's account, and to remove it, at an expense to Martin Marietta of more than $102,000.00. (Manos Trial Test.; Def. Exs. 42–45.) At that point, Martin Marietta believed the parties' disagreement, and Hudson's dissatisfaction with the material, had been resolved. However, after agreeing to the specific invoices to be credited, Hudson has failed and refused, despite numerous demands, to pay its outstanding invoices totaling $20,850.00 for material it used on the Charleston/Colleton Project, which date back to May of 2017. (Manos Trial Test.; Def. Ex. 48.)

## II.     CONCLUSIONS OF LAW

Any findings of fact contained in the Conclusions of Law are incorporated into and deemed to be Findings of Fact.

Hudson brings seven causes of action against Martin Marietta for: (1) breach of contract, (2) negligent misrepresentation, (3) breach of express and implied warranties,

6

(4) negligence, (5) promissory estoppel, (6) equitable estoppel, and (7) equitable indemnity. Because the Court finds that Hudson has failed to meet its burden of proof that any of the purported damages it sustained were caused by any act or omission of Martin Marietta, all seven causes of action fail as a matter of law.

## HUDSON'S CLAIMS

### A.     Hudson Fails to Prove the Elements of Any of Its Causes of Action.

(1) <u>Breach of Contract.</u> Hudson has not shown by a preponderance of the evidence that the material supplied by Martin Marietta did not meet SCDOT Specifications at the time of shipment. Assuming, without deciding, that SE content is a material term of the contract between the parties, Hudson failed to show that Martin Marietta breached that term. Moreover, under the express terms of the Sales Agreement and the Sales Order, if the material is unsatisfactory, Martin Marietta's liability is limited to furnishing replacement material. Martin Marietta provided replacement material which was satisfactory to Hudson. It was not until after shipments of that replacement material began that Hudson once again represented that the material was unsatisfactory, at which point Hudson informed Martin Marietta that it had already switched suppliers, thereby stopping replacement shipments from Martin Marietta. Based on the facts in evidence, Martin Marietta complied with its obligations under the contracts. Thus, Hudson failed to prove its claim for breach of contract. *See generally Odom v. Kelly*, 776 S.E.2d 898 (N.C. App. 2015); *Dillon v. Leazer Group, Inc.*, 374 F. Supp. 3d 547, 555–57 (E.D.N.C. 2019) (holding breach of contract claim subject to dismissal because contract constituted entire agreement between the parties regarding terms and conditions under which plaintiff purchased and defendant supplied, and terms were not breached).

(2) <u>Negligent Misrepresentation.</u> Hudson has not shown by a preponderance of the evidence that the material supplied by Martin Marietta failed to meet SCDOT Specifications at the time of shipment. Thus, Hudson has not demonstrated any false representation by Martin Marietta. Moreover, there is no evidence in the record to establish or even suggest that Martin Marietta failed to exercise due care. To the contrary, Martin Marietta complied with SCDOT testing requirements, and tested the material throughout production. Even if some of the material had tested below 65 for SE prior to leaving the quarry, in light of Dr. Ervin Dukatz's testimony as to the margin of error in SE testing, there is no evidence to suggest Martin Marietta had reason to believe the stockpiled material was non-conforming for SE. Thus, Hudson has failed to prove its claim for negligent misrepresentation. *See generally Brinkman v. Barrett Kays & Associates, P.A.*, 575 S.E.2d 40, 42–44 (N.C. App. 2003).

(3) <u>Breach of Express and Implied Warranties.</u> As an initial matter, the Sales Agreement expressly disclaims and excludes any and all warranties, express or implied, written or oral, not expressly stated therein, including warranties of merchantability or fitness for any particular purpose and all other warranties related to the performance of the material. Such warranty exclusions are valid and enforceable under North Carolina's commercial code, *see* N.C.G.S. § 25-2-316, and are valid and enforceable here. Thus, the only warranty provided by Martin Marietta is that the material will conform to the written specifications in the Sales Order, of which there are none, or with Martin Marietta's customary specifications for that material supplied from that quarry. Hudson failed to show by a preponderance of the evidence that the material supplied by Martin Marietta failed to meet SCDOT Specifications at the time of shipment. For these reasons, Hudson

failed to prove its claim for breach of express and implied warranties.

(4) <u>Negligence.</u> Hudson has not demonstrated that Martin Marietta owed it any non-contractual duty of care, distinct from any contractual duty. Accordingly, Hudson does not have any valid claim for negligence. *See, e.g.*, *Beaufort Builders, Inc. v. White Plains Church Ministries, Inc.*, 783 S.E.2d 35, 39 (2016) (holding that the economic loss rule prohibited plaintiff's claim and explaining, "It is well settled that no negligence claim exists where all rights and remedies have been set forth in a contractual relationship." (citation and quotation marks omitted)).

(5) <u>Promissory Estoppel.</u> North Carolina law "does not recognize promissory estoppel as an affirmative cause action." *Rudolph v. Buncombe County Government*, 846 F. Supp. 2d 461, 477 (W.D.N.C. 2012) ("The clear law in North Carolina prohibits the use of promissory estoppel in an offensive manner.") (citations omitted). Accordingly, Hudson does not have any valid claim based on promissory estoppel.

(6) <u>Equitable Estoppel.</u> "Generally, equitable estoppel is not a cause of action, and may not be used as a sword in a complaint." *Chapel H.O.M. Associates, LLC v. RME Management, LLC*, 808 S.E.2d 578, 579 (N.C. App. 2017) (citation omitted). Accordingly, Hudson does not have any valid claim based on equitable estoppel.

(7) <u>Equitable Indemnity.</u> Equitable indemnity is a remedy, not an independent cause of action. *See Kaleel Builders, Inc. v. Ashby*, 587 S.E. 2d 470, 475 (N.C. App. 2003) ("North Carolina recognizes an implied-in-law right to indemnity when a passive party is made liable for an active party's tortious conduct flowing to and injuring a third party."). Moreover, North Carolina law requires there be an underlying injury sounding in tort. *Id*. ("[T]he parties do not fit the active-passive tort-feasor framework

9

required to support an equitable right to indemnity implied-in-law . . ."). For the reasons set forth above, no such underlying injury exists. Accordingly, Hudson does not have any valid claim based on equitable indemnity.

In addition to the above, Hudson's equitable claims fail for the additional and independent reason that equitable remedies are only available where the plaintiff can establish that no adequate remedy at law exists. *See, e.g.*, *Moore v. Moore*, 252 S.E.2d 735, 738 (N.C. 1979) (holding equitable remedy of specific enforcement of a contract is available only when plaintiff can establish the absence of an adequate remedy at law). Hudson has failed to establish it lacks an adequate remedy at law under the governing contracts.

### B.     Hudson Fails to Prove Causation.

Hudson failed to meet its burden to show that any act or omission of Martin Marietta caused its claimed damages. The testimony and documents offered by Hudson did not establish, by a preponderance of the evidence, that the material supplied by Martin Marietta caused the problems Hudson experienced laying the material. Hudson did not offer any expert opinion to demonstrate causation. There is no evidence in the record to establish that any of the material supplied by Martin Marietta failed to meet SCDOT Specifications at the time of shipment, prior to Hudson taking possession of it. To the contrary, all samples tested from shipping stockpiles at the Cayce Quarry met SCDOT Specifications for SE. In addition to the test results themselves, the opinion testimony of Dr. Dukatz, Martin Marietta's duly qualified expert on micro-surfacing, that the material provided by Martin Marietta met SE specifications was credible and convincing.

Moreover, the clear weight of the evidence shows that there were many factors

that could have caused the problems Hudson experienced with set time, including its own handling and storage of the material. Pictures taken from Hudson's job sites demonstrated that mud and other deleterious materials were permitted to contaminate the stockpiles, which could have resulted in material inconsistencies and specification non-compliance. There was also evidence that issues such as adjustments made to the micro-surfacing mixture, the timeliness of those adjustments, the equipment placing the micro-surfacing, weather, and workmanship could have caused or contributed to the problems Hudson experienced.

It is Hudson's burden to prove by a preponderance of the evidence that the purportedly non-conforming material supplied by Martin Marietta proximately caused the problems it experienced laying the micro-surfacing aggregate. The weight of the evidence supports neither that the material was non-conforming, nor that it proximately caused Hudson's damages. Because Hudson failed to prove causation, its claims fail as a matter of law.

### C.     Hudson Fails to Prove Its Damages.

Because Hudson failed to prove liability on behalf of Martin Marietta, it is not entitled to recover any damages. However, even if it had been entitled to recover damages, such damages would be limited pursuant to the express and unambiguous terms of the Sales Agreement and Sales Order, which limited Martin Marietta's liability to furnishing replacement material in the event the material it supplied was unsatisfactory. Hudson's claims in this lawsuit are prima facie evidence that it found the material to be unsatisfactory. Accordingly, even if Hudson had proven liability, its damages would be limited to furnishment of replacement material, as agreed to by the parties in the

11

governing contracts.

Furthermore, even if Hudson had proven liability and its damages were not limited to furnishment of replacement material, Hudson nonetheless would have been precluded under the express and unambiguous terms of the Sales Agreement from recovering "loss of profits or revenue or . . . any other consequential, incidental, special or punitive damages." Thus, Hudson's claims for lost profits, in the form of "lost production," would not have been recoverable, as such damages are expressly excluded and/or otherwise constitute incidental, consequential, or special damages. Hudson's claims for additional payroll costs and demobilization/remobilization costs are likewise unrecoverable incidental, consequential, or special damages. Finally, any damages based upon projects other than the Charleston/Colleton Project would not be recoverable, as excluded incidental, consequential, or special damages.[2]

## MARTIN MARIETTA'S COUNTERCLAIM

Martin Marietta has shown by a preponderance of the evidence that Hudson owes, but has failed and refused to pay, $20,850.00 in past due invoices for accepted material. This failure to pay constitutes a breach of the parties' contracts. Accordingly, the Court finds for Martin Marietta on its counterclaim for breach of contract.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 26, 2021
Charleston, South Carolina

---

[2] Specifically, damages related to the "Greenville Project" and the "Charleston Project" would not be recoverable. The evidence demonstrated that neither project had begun at the time Hudson switched material suppliers, Martin Marietta supplied no material in connection with either project, and, as to the Charleston Project, no purchase order had even been issued.